UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

CHRISTINA WHITEHURST, *et al.*,

                      Plaintiffs,

             v.

230 FIFTH, INC., *et al.*,

                     Defendants.

----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 21, 2014

11 Civ. 767 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

       This case involves allegations by 13 plaintiffs ("Plaintiffs"), all African-American persons,[1] that Defendant 230FA LLC, doing business as 230 Fifth Avenue, pled herein as 230 Fifth, Inc. ("230 Fifth"), accompanied by certain unidentified individual employees thereof (collectively "Defendants"), discriminated against them on the basis of their race in violation of federal, state, and city law, and further committed state-law breach of contract. Defendants have pled counterclaims against Plaintiffs, alleging tortious interference with prospective economic advantage and tortious interference with contract. Pending before the Court are competing motions for summary judgment. Defendants move for summary judgment as to all of Plaintiffs' claims for relief, including as to two particular plaintiffs on the grounds of judicial estoppel. Plaintiffs move for summary judgment as to all of

---

[1]      Plaintiffs are Christina Whitehurst, Rainell Owens, Nicole Richardson, Ernest Davidson, Qiawni Micou, Lucien Metellus, Jennifer Daniel, Asia Sanders, Marie St. Aude, Cletus Hyacinth, Ellis Whitehurst, Ralph Dejean, and Lorraine Stanford.

Defendants' counterclaims.  For the reasons set forth in the remainder of this Opinion, Defendants' motion is denied in part as to Plaintiffs' discrimination claims, granted in part as to Plaintiffs' breach of contract claims, denied as to the claims of Plaintiff Cletus Hyacinth, and granted as to the claims of Rainell Owens.  Plaintiffs' cross-motion for summary judgment is denied in part as to Defendants' tortious interference with prospective economic advantage counterclaim and granted in part as to Defendants' tortious interference with contract counterclaim.

## BACKGROUND[2]

### A.    The Events of October 10, 2009

This litigation arises from events taking place on October 10, 2009, when Plaintiff Rainell Owens held a birthday party at 230 Fifth.  (Def. 56.1(a) ¶ 38; Pl. 56.1(b) ¶ 38).  230 Fifth is a rooftop lounge at the top of an office building in Manhattan.  (Def. 56.1(a) ¶ 1; Pl. 56.1(b) ¶ 1).

---

[2]    The facts throughout are drawn from the Complaint ("Compl."), the Answer ("Answer"), Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Br."), Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp."), Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ("Def. Reply"), Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Def. 56.1(a)"), Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("Pl. 56.1(b)"), Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment ("Pl. Br."), Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Opp."), Defendants' Counterstatement of Undisputed Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. 56.1(b)"), transcripts from the depositions of Plaintiff Rainell Owens ("Owens Dep."), Salmon Rozenberg ("Rozenberg Dep."), Lucien Metellus ("Metellus Dep."), Asia Sanders ("Sanders Dep."), Cletus Hyacinth ("Hyacinth Dep."), and Ernest Davidson ("Davidson Dep."), and the guest list for 230 Fifth for October 10, 2009 ("Grindlinger Decl. Ex. I").  Where facts are in dispute, both accounts are given.

The events leading up to October 10 are in dispute.  Owens avers that she reached 230 Fifth on the telephone two weeks before the night in question and spoke to an employee of 230 Fifth, known only as "Ruby," to make a reservation for her party.  (Pl. 56.1(b) ¶ 53; Owens Dep. 61:20-23, 62:17-24).  Owens maintains she made a reservation for 25 people.  (Owens Dep. 68:15-18).  During this conversation, as Owens recounts it, she confirmed that there would be no cover charge for a party for whom a reservation had been made (*id.* at 66:7-12); that the party attendees would be able to pay cash at the bar (*id.* at 71:2-5); and that her guests could bring cupcakes, though not a cake, into the venue for the event (*id.* at 71:25-72:9).

Defendants, though not rebutting the specifics of Owens' account, provide undisputed evidence regarding 230 Fifth's general practice when making a reservation for a group.[3]  Individuals making such a reservation are directed to an event coordinator, who would recommend that the host either arrange an open bar or purchase bottle service with one bottle for every six invited guests.  (Def. 56.1(a) ¶¶ 25-31).  Bottle service charges run between $250 and $500 per bottle.  (*Id.* at ¶ 30).  230 Fifth's practice also requires the event coordinator to enter the details of the reservation into a computerized spreadsheet guest list, e-mail the host a confirmation, and provide the host with a credit card authorization form to fill out and return.  (*Id.* at ¶¶ 32-36).

---

[3]    Plaintiffs either admit each paragraph in this section of Defendants' Statement of Undisputed Facts or fail to provide a proper rebuttal.  As discussed below in Section B.1.a, Plaintiffs' statement in response to Defendants' Statement of Undisputed Facts is riven with procedural errors and succeeds in refuting only a few facts submitted by Defendants as undisputed.

No record of Owens' reservation exists, and Owens never filled out a credit card authorization form; indeed, Owens claims that she was never told any of the information customary in 230 Fifth's reservation practice. (Owens Dep. 62:17-91:22).

The events of October 10 at 230 Fifth are, unsurprisingly, disputed, though the balance of Defendants' Statement of Undisputed Facts goes unrebutted by Plaintiffs. It is undisputed that certain Plaintiffs arrived at 230 Fifth before Owens and ordered drinks, mingling with the crowd. (Def. 56.1(a) ¶¶ 42-43; Pl. 56.1(b) ¶¶ 42-43). Owens arrived shortly before 8:00 p.m. and was admitted to 230 Fifth accompanied by a group of Plaintiffs. (Def. 56.1(a) ¶¶ 48-50; Pl. 56.1(b) ¶¶ 48-50). Owens approached the hostess and inquired about her reservation, to which the hostess responded that no such reservation was recorded. (Def. 56.1(a) ¶¶ 52-55; Pl. 56.1(b) ¶¶ 52-55).[4] Owens claims that she then called the Ruby with whom she alleges she made her reservation. (Def. 56.1(a) ¶ 56); Pl. 56.1(b) ¶ 56). Defendants insist there was no employee of 230 Fifth named Ruby (Def. 56.1(a) ¶ 57), a fact Plaintiffs controvert by relying on Owens' testimony regarding her conversation with an individual identifying herself as Ruby, and the existence of a 230 Fifth employee named "Yuttie." (Pl. 56.1(b) ¶ 57).[5]

---

[4]     Plaintiffs controvert the specific sequence of the conversation between Owens and the hostess, but this denial does not alter in any way the content of that conversation.

[5]     Presumably, Plaintiffs mean to suggest that Owens repeatedly misheard the name "Yuttie" as "Ruby," though this point is made nowhere in any of Plaintiffs' submissions. Regardless, the presence or absence of a Ruby at 230 Fifth has no bearing on the disposition of the pending motions.

After a delay of several minutes, Plaintiffs were then seated at a table in the front of the lounge area at 230 Fifth. (Def. 56.1(a) ¶¶ 59-61; Pl. 56.1(b) ¶¶ 59-61).[6] Plaintiffs were then informed that they would have to purchase bottle service to remain in the area where they were seated. (Def. 56.1(a) ¶ 62; Pl. 56.1(b) ¶ 62).[7] Owens purchased four bottles at $250 each, while several other Plaintiffs purchased drinks and food directly. (Def. 56.1(a) ¶¶ 64-65; Pl. 56.1(b) ¶¶ 64-65).

Defendants claim, and Plaintiffs contest, that some Plaintiffs were blocking or obstructing a passageway adjacent to their table. (Def. 56.1(a) ¶ 66; Pl. 56.1(b) ¶ 66). It is undisputed that 230 Fifth received complaints from patrons and employees regarding difficulty passing Plaintiffs' table. (Def. 56.1(a) ¶ 67; Pl. 56.1(b) ¶ 67).[8] A staff member asked the group to sit down. (Def. 56.1(a) ¶ 68; Pl. 56.1(b) ¶ 68). One of Owens' guests was stopped at the door while bringing baked goods into 230 Fifth, but was eventually admitted. (Def. 56.1(a) ¶¶ 69-70; Pl. 56.1(b) ¶¶ 69-70). The presence of these baked goods proved highly controversial, as 230 Fifth grew concerned the baked goods would damage the couch on which certain Plaintiffs were seated. (Owens Dep. 164:22-171:18).

---

[6] Defendants suggest this table was selected so that Owens' guests would easily see the group of Plaintiffs when they arrived at 230 Fifth; Plaintiffs rightly point out that no evidence indicates the rationale for the location in which Plaintiffs' party was seated. (Def. 56.1(a) ¶ 61; Pl. 56.1(b) ¶ 61).

[7] Though Plaintiffs avow a denial of Defendants' claim on this point, they acknowledge that Owens ultimately did purchase bottle service.

[8] Plaintiffs deny this statement but fail to cite any evidence in support of their denial.

Case 1:11-cv-00767-KPF-RLE   Document 75   Filed 02/21/14   Page 6 of 49

After receiving more complaints from other patrons regarding Plaintiffs, a 230 Fifth manager instructed Plaintiffs to leave the lounge, though the conduct and content of this interaction — and its legal significance — are hotly disputed between the parties.  (Def. 56.1(a) ¶ 73; Pl. 56.1(b) ¶ 73).  Shortly thereafter, the group left 230 Fifth; Owens was not charged for the bottle service she ordered.  (Def. 56.1(a) ¶¶ 74-75; Pl. 56.1(b) ¶¶ 74-75).

Defendants contend that after Plaintiffs left the club, certain members of their party remained outside on the sidewalk.  (Answer ¶ 185).  It is undisputed that a line of people stood waiting to enter 230 Fifth.  (Def. 56.1(b) ¶ 5).[9]  There, Defendants allege, a "minimum [of] three or five" members of Plaintiffs' party (Rozenberg Dep. 49:2-3) blocked the entrance to the lounge by standing in the small area in front of the door (*id.* at 46:24-49:9) for more than five or ten minutes (*id.* at 50:10-21).  Another group of Plaintiffs, Defendants insists, told people in line not to enter 230 Fifth (*id.* at 51:21-52:5, 70:8-13), singling out African-American individuals in the line and urging them not to give 230 Fifth their business (*id.* at 52:6-12).  Salmon Rozenberg, a 230 Fifth employee, testified that he saw "several groups" (*id.* at 80:21) of people step out of line during this alleged incident, though he could not state "the exact number," nor whether "any of those people" came back later (*id.* at 80:23-81:4).

---

[9]  In Defendants' statement pursuant to Local Rule 56 disputing the facts offered by Plaintiffs in support of Plaintiffs' motion for summary judgment, Defendants also submitted several additional, purportedly undisputed facts.  (Def. 56.1(b) ¶¶ 5-7).  Plaintiffs filed no responsive statement and so these submissions must be deemed as admitted.  As discussed below at Section B.2.a, Plaintiffs' own Statement of Undisputed Facts is stricken from the record due to its procedural defects.

**B.      Procedural History**

On January 13, 2011, Plaintiffs notified Defendants, in accordance with New York Civil Rights Law §§ 40-41, that they intended to file a complaint alleging discriminatory treatment; they included with that notice copies of a summons and a verified complaint.  (Dkt. #1 ¶¶ 1-2).  Defendants timely removed the action to this Court on February 3, 2011.  (Dkt. #1).  The Complaint alleged violations of federal civil rights law, specifically, 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988, and 2000a; as well as the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 ("NYSHRL"); the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 1 to 91 ("NYCRL"); the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 ("NYCHRL"), and common-law breach of contract.  (Dkt. #1, Ex. A ¶¶ 72-115).

On March 11, 2011, Defendants moved to dismiss all claims in the Complaint except for Plaintiffs' breach of contract claim (Dkt. #6-8), and simultaneously entered counterclaims against Plaintiffs for tortious interference with prospective economic advantage and tortious interference with contract (Dkt. #10 ¶¶ 69-84).  Plaintiffs did not timely respond to Defendants' counterclaims against them, and accordingly Defendants moved for default judgment as to their counterclaims on April 14, 2011.  (Dkt. #14-16).  Plaintiffs opposed Defendants' motion to dismiss on April 18, 2011 (Dkt. #18), and Defendants made a reply in further support of their motion to dismiss on April 25, 2011 (Dkt. #9).  Plaintiffs then opposed Defendants' motion for default judgment on April 27, 2011 (Dkt. #20), and Defendants

replied in further support of that motion on May 4, 2011 (Dkt. #22).  By

Opinion and Order of July 26, 2011, the Court granted in part and denied in

part Defendants' motion to dismiss, dismissing Plaintiff's claims for relief

pursuant to 42 U.S.C. §§ 1983, 1985, 1986, 1988, 2000a, and a duplicative

claim under § 1981, but permitting Plaintiffs' claims under § 1981 and the

NYSHRL, the NYCRL, and the NYCHRL.  (Dkt. #23).[10]

On August 9, 2011, Defendants answered the Complaint, once again

making counterclaims against Plaintiffs.  (Dkt. #24).  Plaintiffs did not respond

to these counterclaims and Defendants obtained a certificate of default from

the Clerk of Court and moved for default judgment on the counterclaims on

September 12, 2011.  (Dkt. #27-29).  Plaintiffs then answered the

counterclaims on September 19, 2011.  (Dkt. #32).  By memorandum

endorsement on September 26, 2011, the Court vacated the Clerk's certificate

of default and terminated Defendants' motion for default judgment.  (Dkt. #33).

On February 28, 2013, the parties entered a stipulation of partial

dismissal with respect to two Plaintiffs in the original action, Dina Gardner and

Takita Mason, dismissing both their claims against Defendants and

Defendants' counterclaims against them.  (Dkt. #40).

Defendants requested leave to file a motion for summary judgment with

respect to all Plaintiffs' surviving claims by letter dated August 1, 2013.  (Dkt.

---

[10]     At that time, this action was before the Honorable Colleen McMahon, United States
District Judge for the Southern District of New York.  It was reassigned to the
Honorable Andrew L. Carter, United States District Judge for the Southern District of
New York, on December 29, 2011 (Dkt. #34), and then to the undersigned on June 25,
2013 (Dkt. #42).

#47).  Plaintiffs requested leave to file a cross-motion for summary judgment with respect to Defendants' counterclaims by letter dated August 5, 2013. (Dkt. #51).  The Court held a pre-motion conference on August 8, 2013, and Defendants filed their motion for summary judgment, with a memorandum of law, an attorney declaration, and a Local Rule 56 statement in its support, on September 11, 2013.  (Dkt. #52-55).  Plaintiffs made their own motion for summary judgment against Defendants' counterclaims, accompanied by a memorandum of law, attorney declaration, and Local Rule 56 statement, on September 20, 2011.  (Dkt. #60-63).  Defendants opposed Plaintiffs' motion for summary judgment on October 15, 2011.  (Dkt. #64-66).  Plaintiffs opposed Defendants' motion for summary judgment on October 16, 2011.  (Dkt. #67-68).  Defendants made a reply in further support of their motion for summary judgment on November 15, 2013.  (Dkt. #74).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex,* 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under

9

the governing law," and is genuinely in dispute "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.

10

1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### 2.    Discrimination Claims

"To establish a claim under § 1981, a plaintiff must allege facts to support the following elements: [i] the plaintiff is a member of a racial minority; [ii] defendant intended to discriminate against plaintiff on the basis of race; and [iii] the discrimination concerned one or more of the activities enumerated in the statute…." *Harris* v. *Allstate Ins. Co.*, 83 F. Supp. 2d 423, 431 (S.D.N.Y. 2000) (citing *Weiss* v. *La Suisse*, 69 F. Supp. 2d 449, 460 (S.D.N.Y. 1999)).  The same analysis applies to Plaintiffs' pendent state-law claims.  *Id.* at 431 n.3 ("Because New York courts require the same standard of proof for discrimination claims brought pursuant to state law as that required for federal discrimination claims, we will analyze these claims in tandem." (citing *Quinn* v. *Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998); *Farrell* v. *Child Welfare Admin.*, 77 F. Supp. 2d 329, 332 (E.D.N.Y. 1999); *Rivera* v. *Hertz Corp.*, 990 F. Supp. 234, 236 (S.D.N.Y. 1997))).

"A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*" *Broich* v. *Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir.

11

2012) (summary order) (citing *Gant ex rel. Gant* v. *Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999)), *cert. denied*, 133 S. Ct. 527 (2012). "A plaintiff can prove intentional discrimination through either direct or circumstantial evidence." *Bary* v. *Delta Airlines, Inc.*, No. 02 Civ. 5202 (DGT), 2009 WL 3260499, at *8 (E.D.N.Y. Oct. 9, 2009).

 "In general, an inference of discrimination may be drawn from various circumstances, including direct evidence of 'the [defendant's] criticism of the plaintiff[] ... in ethnically degrading terms; or its invidious comments about others in the [plaintiff's] protected group.'" *Anyanwu* v. *City of New York*, No. 10 Civ. 8498 (AJN) (THK), 2013 WL 5193990, at *10 (quoting *Chambers* v. *TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). The Second Circuit has observed that direct "smoking-gun evidence" of discrimination is often lacking. *Id.* at *10 n.4. "A victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.* at *10 (quoting *Rosen* v. *Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (alteration in original)).

When relying on indirect evidence, plaintiffs' claims of discrimination are assessed under the framework set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-03 (1973):

> Under that framework, a plaintiff must satisfy the minimal burden of making out a *prima facie* case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff.

*Slattery* v. *Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001).

"Although the plaintiff's initial burden of making a prima facie case is a light one, the complaint must state more than conclusory allegations of discrimination." *Harris*, 83 F. Supp. 2d at 431; *see also Scaria* v. *Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) (per curiam) ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal.")

"[A]n inference of discrimination" can be drawn when "similarly situated" individuals were "treated differently." *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). "Similarly situated" parties to the plaintiff "need not be identical, but there should be a reasonably close resemblance of facts and circumstances. What is key is that they be similar in significant respects." *Lizardo* v. *Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) (internal citation and quotation marks omitted).

Should the plaintiff succeed in meeting the "'minimal'" burden of its prima facie case, *McPherson* v. *New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (quoting *Woodman* v. *WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005), the defendant must then articulate legitimate rationales for the identified actions. The defendant's burden at this second stage is "equally 'non-demanding.'" *Jimenez* v. *City of New York*, 605 F. Supp. 2d 485, 521-22 (S.D.N.Y. 2009) (quoting *Bickerstaff* v. *Vassar College*, 196 F.3d 435, 446 (2d Cir. 1999)). "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher* v. *Vassar Coll.*, 114

13

F.3d 1332, 1335-36 (2d Cir. 1997), *abrogated on other grounds by Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000).

If a defendant succeeds in meeting this burden of proof, the burden returns to the plaintiff to demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 253 (1981). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *Burdine*, 450 U.S. at 253). Even if a plaintiff succeeds in showing pretext, a court "must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder ... that defendants intentionally discriminated against them on the basis of their race." *Lizardo*, 270 F.3d at 103. Plaintiffs may "'establish pretext and thereby successfully oppose summary judgment, ... by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action.'" *Ramos* v. *Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 343-44 (S.D.N.Y. 2001) (quoting *Cruse* v. *G&J USA Publishing*, 96 F. Supp. 2d 320, 329 (S.D.N.Y. 2000)) (alterations in *Ramos*). "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." *Holcomb*, 521 F.3d at 141 (citing *Reeves*, 530 U.S. at 147).

Nonetheless, "such evidence of pretext is 'simply one form of circumstantial evidence that is probative of intentional discrimination,' and — when combined with a prima facie case — may not be enough to withstand a defendant's motion for summary judgment." *Tarshis* v. *Riese Org.*, 195 F. Supp. 2d 518, 525 (S.D.N.Y. 2002), *aff'd*, 66 F. App'x 238 (2d Cir. 2003) (summary order) (quoting *Reeves*, 530 U.S. at 147).  Whether a plaintiff meets her burden "will depend on a number of factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that [the] employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Id.* (quoting *Reeves*, 530 U.S. at 148-49).

### 3.     Breach of Contract

"The essential elements to pleading a breach of contract under New York law are the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the plaintiff." *Startech, Inc.* v. *VSA Arts*, 126 F. Supp. 2d 234, 236 (S.D.N.Y. 2000). "However, under Fed. R. Civ. P. 8(a)(2), it is not necessary to plead separately the elements of a claim for a breach.  It is sufficient that the claim shows that the pleader is entitled to relief." *Id.*

"Under New York law, absent a written agreement between the parties, 'a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct.'" *Bader* v. *Wells Fargo Home Mortgage Inc.*, 773 F. Supp. 2d 397, 413

(S.D.N.Y. 2011) (quoting *Bear Stearns Inv. Products, Inc.* v. *Hitachi Automotive Products (USA), Inc.*, 401 B.R. 598, 615 (S.D.N.Y. 2009)).  An implied contract requires "'consideration, mutual assent, legal capacity and legal subject matter' to be established."  *Fink* v. *Time Warner Cable*, 810 F. Supp. 2d 633, 645 (S.D.N.Y. 2011), *on reconsideration*, No. 08 Civ. 9628 (LTS) (KNF), 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011) (quoting *Maas* v. *Cornell University*, 721 N.E.2d 966, 970 (N.Y. 1999)).

"Under New York law, a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract."  *D'Andrea* v. *Rafla-Demetrious*, 3 F. Supp. 2d 239, 246 (E.D.N.Y. 1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998 (citing *S & K Sales Co.* v. *Nike, Inc.*, 816 F.2d 843, 852 (2d Cir. 1987)).  Moreover, New York law "'does not countenance damage awards based on speculation or conjecture.'"  *Id.* (quoting *Wolff & Munier, Inc.* v. *Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991)).

### 4.   Judicial Estoppel

"Judicial estoppel 'is an equitable doctrine that can be invoked by a court at its discretion.'"  *Raizberg* v. *JV CJSC Gulfstream Sec. Sys.*, No. 11 Civ. 8498 (KMW), 2013 WL 1245545, at *3 (S.D.N.Y. Mar. 26, 2013) (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 750 (2001)).

The doctrine applies when "'[i] a party's later position is clearly inconsistent with its earlier position; [ii] the party's former position has been adopted in some way by the court in the earlier proceeding; and [iii] the party asserting the two positions would derive an unfair advantage against the party

16

seeking estoppel.'" *Oklahoma Firefighters Pension & Retirement System* v. *Student Loan Corp.*, No. 12 Civ. 895 (NRB), 2013 WL 3212297, at *10 n.6 (S.D.N.Y. June 25, 2013) (quoting *DeRosa* v. *Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)) (internal quotation marks omitted)).

Because "[t]he purpose of judicial estoppel is ... 'to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment,'" *In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011) (quoting *New Hampshire* v. *Maine*, 532 U.S. at 749-50), the Second Circuit has limited "'judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain,'" *DeRosa*, 595 F.3d at 103 (quoting *Uzdavines* v. *Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005)).

"Judicial estoppel does not apply 'if the statements or positions in question can be reconciled in some way,' [or] if the initial statement was the result of a good faith mistake or an unintentional error." *Am. Mfrs. Mut. Ins. Co.* v. *Payton Lane Nursing Home, Inc.*, 704 F. Supp. 2d 177, 194 (E.D.N.Y. 2010) (quoting *Negron* v. *Weiss*, No. 06 Civ. 1288 (CBA), 2006 WL 2792769, at *4 (E.D.N.Y. Sept. 27, 2006) (internal citation omitted)).

"Judicial estoppel is often applied 'to prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'" *Azuike* v. *BNY Mellon*, No. 12 Civ. 5198 (NRB), 2013 WL 3917264, at *5 (S.D.N.Y. July 30, 2013) (quoting *Ibok* v. *SIAC-Sector Inc.*, 470 F. App'x 27, 28 (2d Cir. 2012) (summary order)).

17

### 5.   Tortious Interference with Prospective Economic Advantage

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that: '[i] it had a business relationship with a third party; [ii] the defendant knew of that relationship and intentionally interfered with it; [iii] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [iv] the defendant's interference caused injury to the relationship.'" *Fifth St. Fin. Corp.* v. *Toll*, No. 12 Civ. 5896 (ER), 2013 WL 3757037, at *3 (S.D.N.Y. July 17, 2013) (quoting *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006)).

The third element poses a "particularly high hurdle, for it requires a plaintiff to show that the defendant 'committed a crime or an independent tort [such as fraud], or [acted] for the sole purpose of inflicting intentional harm' on the plaintiff." *Enzo Biochem, Inc.* v. *Molecular Probes, Inc.*, No. 03 Civ. 3816 (RJS), 2013 WL 6987615, at *3 (S.D.N.Y. Dec. 6, 2013) (quoting *Plasticware, LLC* v. *Flint Hills Resources, LP*, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (internal quotation marks omitted) (alterations in *Enzo*)).   "Further, the plaintiff must establish that it 'would have entered into an economic relationship [with the third party] but for the defendant's wrongful conduct.'" *CHoldings B.V.* v. *Asiarim Corp.*, No. 12 Civ. 928 (RJS), 2013 WL 6987165, at *9 (S.D.N.Y. Dec. 16, 2013) (quoting *Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009)) (alterations in *CHoldings*).

### 6.     Tortious Interference with Contract

Tortious interference with contract requires that: (i) a valid contract exist between the plaintiff and a third party, (ii) the defendant actually knew of that contract, (iii) the defendant intentionally and without justification brought about the third party's breach of that contract, (iv) the contract was actually breached, and (v) the plaintiff was damaged by the breach.  *See CHoldings*, 2013 WL 6987165, at *14 (citing *Valley Lane Indus. Co.* v. *Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 104 (2d Cir. 2012) (summary order)).

## B.     Application

### 1.     Defendants' Motion for Summary Judgment

Defendants move for summary judgment against all Plaintiffs' claims.  As explained below, summary judgment is denied as to Plaintiffs' discrimination claims and granted as to Plaintiffs' breach of contract claim.  Summary judgment on the basis of judicial estoppel is denied as to Plaintiff Cletus Hyacinth and granted as to Plaintiff Rainell Owens.

#### a.     Plaintiffs' Local Rule 56.1 Statement Is Seriously Deficient

First, the Court must address the adequacy *vel non* of Plaintiffs' statement pursuant to Local Rule 56.1.  Local Rule 56.1 provides that "[e]ach [paragraph in the moving party's 56.1 statement] will be deemed to be admitted for purposes of the motion unless specifically controverted by [the opposing party, relying on] … evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

Defendants argue in their reply brief that all or almost all the facts submitted in Defendants' statement of undisputed facts go unrebutted and thus must be accepted as true.  (Def. Reply 2-4).  In many cases, they are correct.  Plaintiffs frequently deny a statement without a citation to any evidence at all, violating the express language of Local Rule 56.  In some cases Plaintiffs refuse to admit or deny a particular statement, submitting only that they "lack knowledge or information sufficient to form a belief as to" the statement in question.  (*See, e.g.*, Pl. 56.1(b) ¶ 26).  This is not a permissible basis on which to rebut a fact submitted as undisputed by a moving party.  *See Cooper* v. *City of New Rochelle*, 925 F. Supp. 2d 588, 602 (S.D.N.Y. 2013) (quoting *AFL Fresh & Frozen Fruits & Vegetables, Inc.* v. *De-Mar Food Serv. Inc.*, No. 06 Civ. 2142 (GEL), 2007 WL 4302514, at *4 (S.D.N.Y. Dec. 7, 2007)).

In other cases in which Plaintiffs do cite evidence, the cited evidence has no bearing whatsoever on the statement it purportedly refutes.  (*See, e.g.*, Pl. 56.1(b) ¶¶ 29, 32, 35-37 (purporting to contradict statements regarding what Plaintiff Owens was told on the phone by a 230 Fifth employee by citing a page of Owens' deposition testimony exclusively discussing her family relationships and housing arrangements)).  And twice Plaintiffs attempt to refute facts included in their Complaint, though the allegations in the Complaint are judicial admissions to which Plaintiffs are bound.  *Clarke* v. *JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400 (CM) (DCF), 2010 WL 1379778, at *14 (S.D.N.Y. Mar. 26, 2010) (quoting *Official Comm. of the Unsecured Creditors of Color Tile, Inc.* v. *Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)).

In all of these cases, Plaintiffs have effectively admitted the fact at

issue.[11]  Having reviewed Defendants' and Plaintiffs' respective Local Rule 56

statements, the Court concludes that Plaintiffs have adequately rebutted nine

of Defendants' statements.  (*See* Pl. 56.1(b) ¶¶ 46, 47, 52, 61, 66, 73, 74, 76,

77).  Some of these refutations are of little or no importance in resolving

Defendants' pending motion.  (*See, e.g.*, Pl. 56.1(b) ¶ 52).  Others are

potentially significant.  (*See, e.g.*, Pl. 56.1(b) ¶¶ 66, 77).  But irrespective of

their significance, these are the only disputed facts from which an issue of

material fact could arise.

### b.   Summary Judgment Is Denied as to Plaintiff's Discrimination Claims

Defendants move for summary judgment on Plaintiffs' claims for

unlawful discrimination.[12]  Because Plaintiffs have provided sufficient evidence

---

[11]   Defendants also argue that Plaintiffs should be treated as having admitted facts which
they contravene by relying on the testimony of certain Plaintiffs, despite the fact that
the testimony of other Plaintiffs supports Defendants' position.  (Def. Reply 3-4).  Some
courts have indeed concluded that a plaintiff cannot create an issue of material fact so
as to survive summary judgment purely by contradicting the sworn testimony of a co-
plaintiff.  *See Harper* v. *Ulta Salon Cosmetics & Fragrance, Inc.*, No. 05-cv-1285-TWT,
2007 WL 528088, at *20 (N.D. Ga. Feb. 13, 2007); *Carey* v. *Shiley, Inc.*, 32 F. Supp. 2d
1093, 1101 (S.D. Iowa 1998).  However, at summary judgment, a court's responsibility
"is not to resolve disputed issues of fact but to assess whether there are any factual
issues to be tried."  *Brod* v. *Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting
*Wilson* v. *NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).  "'Assessments of credibility
and choices between conflicting versions of the events are matters for the [factfinder],
not for the court on summary judgment.'"  *Jeffreys*, 426 F.3d at 553-54 (quoting *Rule* v.
*Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).  This maxim holds as true between
competing accounts among co-plaintiffs as between those offered by opposing parties.
The Court accordingly concludes that contradictory co-plaintiff testimony, without
more, is not enough to invalidate an otherwise properly supported denial in a non-
movant's statement under Local Rule 56.1.

[12]   Plaintiffs' surviving claims are pursuant to Section 1981, the NYSHRL, the NYCRL, and
the NYCHRL.  Defendants note in their reply that "Plaintiffs' Opposition does not
mention their [NY]CHRL claim.  As such, Plaintiffs have abandoned that claim and
summary judgment should be awarded to" Defendants.  (Def. Reply. 5 n.2).  The
authority they cite for this claim is a Second Circuit case holding that a plaintiff had

for the ultimate factfinder reasonably to conclude that Defendants were indeed
motivated by impermissible discriminatory intent and that the
nondiscriminatory rationales Defendants contend motivated their actions
against Plaintiffs are mere pretexts to conceal this racial animus, Defendants'
motion is denied.

Plaintiffs point to no direct evidence of racial discrimination, such as
expressly "ethnically degrading terms" or "invidious comments" about African-
Americans in general.  *Chambers*, 43 F.3d at 37.  Accordingly the Court will
employ the *McDonnell-Douglas* burden-shifting framework common in
assessing indirect evidence of intentional discrimination in violation of Section
1981.  *See Lizardo*, 2000 WL 976808, at *2.

Plaintiffs succeed in meeting the "minimal" burden of making a prima
facie case of intentional discrimination.  *Slattery*, 248 F.3d at 91.  Plaintiffs
claim, and Defendants do not refute, that Owens made a reservation for a large
party two weeks in advance.  (Owens Dep. 61:20-92:2).[13]  Defendants

---

abandoned claims against John Doe parties named in his complaint when he failed to
mention those parties in his briefs appealing a grant of summary judgment against
those claims.  *Southerland* v. *City of New York*, 680 F.3d 127, 139 n.12 (2d Cir. 2011).
This authority is inapposite in several ways: this is an action in the first instance, not
on appeal; here, no disposition has been granted whose effect Plaintiffs must contest for
the claim to survive; Defendants identify a specific claim, not an identified party, they
allege is waived by Plaintiffs' failure to defend it; and here all four discrimination claims,
though formally distinct, are analytically identical.  Moreover the Second Circuit has
elsewhere offered much more relevant instruction on how to approach this
circumstance: an unopposed motion for summary judgment "may properly be granted
only if the facts as to which there is no genuine dispute," *Champion* v. *Artuz*, 76 F.3d
483, 486 (2d Cir. 1996) (per curiam), show that "the movant is entitled to judgment as a
matter of law," Fed. R. Civ. P. 56(a).  Thus the Court will consider the NYCHRL claim
exactly as it does the Section 1981, NYSHRL, and NYCRL claims, and deny summary
judgment as to it for the same reasons.

[13]   It is intimated, though never explicitly argued, in Defendants' papers that Owens never
       made this reservation and may be fabricating her entire interaction with 230 Fifth

acknowledge that when Owens arrived at the hostess stand and inquired about her reservation, the hostess informed her that no reservation apparently existed.  (Def. 56.1(a) ¶ 55; Pl. 56.1(b) ¶ 55).  Eventually seated, Plaintiffs were required to purchase bottle service to the tune of $1,000 (Owens Dep. 138:3-4), despite never being informed, according to their undisputed account, of such a requirement for a party of their size (*id.* at 125:17-19).  They were given a table at the front of the lounge immediately adjacent to a walkway and a 230 Fifth manager denied their requests to move.  (Def. 56.1(a) ¶ 61; Pl. 56.1(b) ¶ 61; Owens Dep. 133:14-134:20).  230 Fifth employees instructed Plaintiffs to be seated, purportedly because some members of the group were obstructing a nearby pathway.  (Def. 56.1(a) ¶ 68; Pl. 56.1(b) ¶ 68).

An issue of material fact exists regarding whether Plaintiffs were actually impeding the movement of any patrons or employees.  (Def. 56.1(a) ¶ 66; Pl. 56.1(b) ¶ 66; *compare* Rozenberg Dep. 30:22-31:6, *with* Owens Dep. 157:5-19 ("Q: ... [I]sn't it possible that you could have been blocking some exits, pathways unintentionally?  A: But we weren't.  We weren't.")).  Owens observed that other groups throughout the lounge were not "being told to sit down" or "to move out of the aisle" or that they couldn't sit in a specific area, and observed that some groups apparently had not ordered bottle service.  (Owens Dep. 159:11-160:9).

---

before her arrival at the lounge on the night in question.  As credibility determinations are left for the ultimate factfinder and are not appropriately resolved on summary judgment, see n.12 *supra*, the Court has ignored this issue throughout this Opinion and Order.

Owens also contends that 230 Fifth staff throughout the night treated Plaintiffs with sarcasm, contempt, and anger.  (*See* Owens Dep. 137:22-138:2, 168:18-169:5, 176:17-177:9, 181:15-182:21, 184:15-186:18).  Finally, Plaintiffs were asked to leave the lounge during an encounter with the owner of 230 Fifth.  There is a separate issue of material fact regarding the conduct of this conversation: Plaintiffs submit that it was emotional and contemptuous and included numerous instances of ambiguously derogatory terms like "you people," while Defendants suggest it was straightforward and direct.  (Def. 56.1(a) ¶ 73; Pl. 56.1(b) ¶ 73).

An inference of discrimination can be drawn from identifying other groups, similarly situated, who received better treatment.  *Shumway*, 118 F.3d at 63.  "Similarly situated" parties "need not be identical, but there should be a reasonably close resemblance of facts and circumstances."  *Lizardo*, 270 F.3d at 101.  Defendants argue, and the Second Circuit has held, that the comparative size of two groups is "an obviously significant factor in restaurant seating" when considering whether two groups are "similarly situated" for *McDonnell-Douglas* purposes.  *Id.  Lizardo*, however, does not stand for the proposition Defendants adduce from it.  In *Lizardo*, the Second Circuit held that the size of a group is "an obviously *significant factor*," not an essential criterion, when analyzing the similarity of two groups.  *Id.* (emphasis added).  Moreover *Lizardo* dealt with the seating of groups at restaurant tables designed to accommodate a specific number of people: there, the plaintiffs sought to draw an inference of discrimination from the fact that three parties of three to

24

four white patrons were seated before their party of five to seven minority patrons. *Id.* Differences so small in number matter a great deal when seating parties at tables with two, four, or eight chairs; they matter much less when admitting parties to a rooftop lounge. Though still relevant — a party of five hundred is probably not similarly situated to a party of five — this factor is simply less important given the facts alleged here.

Defendants note that two other parties in 230 Fifth that night numbered 50 and 100 guests, respectively, and submit that these groups are too different in number to be similarly situated to Plaintiffs. (Def. Br. 14-15). In a two-story entertainment venue atop an office building in Midtown Manhattan (Rozenberg Dep. 17:22-18:6), the difference between, for example, a party of 25 (like Plaintiffs'), and a party of 50 (like another of the groups at 230 Fifth on October 10, 2009), is not enough for the Court to conclude as a matter of law that the two groups are not similarly situated.

What is more, though Defendants refer to only two other groups present on the night in question — one group of 50 guests and one group of 100 — the guest list submitted by Defendants themselves in support of their motion for summary judgment identifies 12 other groups expected at 230 Fifth on the night in question, including two groups of 18, a group of 15 to 18, and a group of 25. (Grindlinger Decl. Ex. I). Owens testified that she saw a group of 5 people and a group of 10 people in the lounge. (Owens Dep. 161:22-162:5). Another Plaintiff, Lucien Metellus, testified that he saw "other large groups"

25

with the "same" number as in Plaintiffs' party.  (Metellus Dep. 100:2-6).  These groups are not so different in number as to defy analytical comparison.

Given the presence of groups that a reasonable factfinder could conclude were similarly situated, then, and evidence that Plaintiffs received markedly sarcastic and abusive treatment from 230 Fifth throughout the night in question while other similar situated groups received better treatment, Plaintiffs have met their "minimal" burden of making a prima facie case of intentional discrimination.

Defendants have, by the same token, adequately offered nondiscriminatory rationales for their actions toward Plaintiffs.  Defendants have submitted without refutation by Plaintiffs that 230 Fifth received multiple complaints from other patrons and staff about Plaintiffs' disorderly conduct and obstruction of a passageway at the front of the lounge.  (Def. 56.1(a) ¶¶ 67, 68, 72).  230 Fifth finally asked Plaintiffs to leave, attributing that request to the impression that Plaintiffs had disrupted the lounge environment.  (Owens Dep. 168:20-169:3).  Based on these submissions, a reasonable factfinder could conclude that these submissions satisfy Defendants' burden to demonstrate alternative rationales for their treatment and eventual ejection of Plaintiffs.

Sadly, the Court must pause here to discuss baked goods.  It is undisputed that one of Owens' guests brought baked goods into 230 Fifth to celebrate Owens' birthday.  (Def. 56.1(a) ¶ 70; Pl. 56.1(b) ¶ 70).  Neither party has clearly explained the nature or significance of these baked goods.  Owens

testified that when she called 230 Fifth to make a reservation for her party, she was told that she could bring cupcakes, but not a cake, into the lounge out of a concern over the potential risks posed by the use of a knife during the cake-cutting process.  (Owens Dep. 71:25-72:9).  Thus it is correct, as Defendants submit in a statement under Local Rule 56 (and as Plaintiffs admit by failing to refute it), that "Owens was aware of the fact that Defendant prohibited individuals from bringing cake onto the premises."  (Def. 56.1(a) ¶ 71; Pl. 56.1(b) ¶ 71).

However, Owens, despite frequent unclear language in her deposition, maintained the consistent position throughout that her guest brought cupcakes, not a cake, as Owens believed she was permitted to do.  These cupcakes were carried in a cupcake holder decorated with a Styrofoam centerpiece that had been artfully covered with decorative fondant to resemble a birthday cake.  (*See* Owens Dep. 143:14-17 ("I get a call from one of my girlfriends that says … [t]hey're not allowing her upstairs with the cake."); *id.* at 147:11-16 ("Q: Is this on top a cake?  A: Yes.  Q: So it was both a cake and cupcakes?  A: It was cupcakes, but the top tier was my souvenir.  It wasn't to be eaten.  It's Styrofoam."); *id.* at 170:15-17 ("[T]he inside is Styrofoam anyway.  The just the top fondant. *[sic]* You can eat the candy on the side but that's about it.")).

At the same time, Owens acknowledged that the resemblance of the Styrofoam centerpiece to an actual, forbidden cake was pronounced and that she had been deceived herself.  (*See* Owens Dep. 169:13-19 ("Q: … Now, the

decoration on top, is it fair to say it looks like a cake?  A: Right.  Q: And that if you only saw a picture of it, it might actually be a cake?  A: Right.”): *id.* at 170:7-15 (“Q: So you … respected the rule that you couldn't bring cakes into the establishment?  A: They told me I could bring cakes, I could bring cupcakes as long as there was no cutting of the cake involved.  I told him that this top tier will stay on here.  I didn't learn until … then and there the inside is Styrofoam anyway.”)).  Thus, on Owens' own account, as far as Defendants could tell, Plaintiffs were violating one of 230 Fifth's legitimate, nondiscriminatory policies in addition to endangering the lounge's furniture and, given the lounge's expressed concerns regarding the use of knives, possibly the safety of its guests and staff.  Defendants justifiably may point to the baked-goods controversy as a separate, nondiscriminatory rationale for their eventual ejection of Plaintiffs on October 10, 2009, and a reasonable factfinder could credit that rationale.  (*See* Owens Dep. 171:12-18).

Therefore, the burden returns once more to Plaintiffs to demonstrate that these rationales offered by Defendants are pretextual.  The question here is close but, examining the record in its entirety, a reasonable factfinder could conclude that Plaintiffs succeed at this last step of the *McDonnell-Douglas* analysis.  Plaintiffs were seated in a dispreferred location at the entrance to the lounge.  230 Fifth denied, without explanation, Plaintiffs' request to move to other open, preferable areas.  (Owens Dep. 134:14-19 (“Q: And what did he say when you asked to be moved?  A: 'No, absolutely not.'  Q: Did he give you a reason?  A: No.  He said 'No' and he walked away.”).  Plaintiffs were required to

purchase bottle service despite never having been warned that such a purchase would be required — and despite, on their account, observing at least one group that had not faced the same requirement.

Though Defendants contend that 230 Fifth received complaints from other patrons regarding Plaintiffs throughout the night (Def. 56.1(a) ¶ 72), Defendants cannot establish that Plaintiffs indeed inconvenienced other guests or staff of 230 Fifth by obstructing foot traffic (Pl. 56.1(b) ¶ 66).  Nor do any complaints received justify the ill treatment Plaintiffs allege they experienced beginning with their arrival at the lounge, long before any such complaints could possibly have made, and continuing thereafter throughout their time at 230 Fifth that night.

As part of their effort to demonstrate that Defendants' offered rationales are pretexts concealing discriminatory intent, Plaintiffs also point to the numerous occasions on which 230 Fifth staff referred to them as "you people," "these people," or "those people" in a derogatory, albeit not expressly discriminatory, context.  (Owens Dep. 150:8-11 ("'Get these people out of here. They're ruining my sofa....  Get them the fuck out of here.  Whatever you need to do, get them out.'"), 168:20-25 ("'You people need to get out of here....  I don't care what you do, you need to get the F out [of] here.  They're jumping on my sofas.  They're in my aisles.'"); *see also id.* at 185:4-6, 185:13-20). Admittedly, as Defendants rightly point out, "racially[] ambiguous, sporadic remarks" are not, without more, sufficient "evidence of race discrimination," *Big Apple Tire, Inc.* v. *Telesector Res. Grp., Inc.*, 476 F. Supp. 2d 314, 327

29

(S.D.N.Y. 2007), especially when "there is insufficient evidence from which a

reasonable fact finder could conclude that the question was laced with racial

innuendo as opposed to" a neutral, commonplace effort to identify the group

being addressed, *Feacher* v. *Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389,

404 (N.D.N.Y. 2008).  But phrases such as "'you people' ... could just as easily

be interpreted as [having] a negative racial connotation," *Wooten* v.

*Reconstruction Home, Inc.*, No. 02 Civ. 01278 (NPM), 2005 WL 1502149, at *11

(N.D.N.Y. June 24, 2005), especially when Plaintiffs provide persuasive "greater

specificity as to the context of [such phrases'] usage," *Griffin* v. *Ambika Corp.*,

103 F. Supp. 2d 297, 314 (S.D.N.Y. 2000).  *See Wooten*, 2005 WL 1502149, at

*11 (N.D.N.Y. June 24, 2005) (concluding that use of "you people," combined

with evidence of discriminatory treatment that began only after the defendant

discovered that the plaintiff was African-American, could provide a partial basis

for drawing an inference of discrimination).[14]  And here, where Plaintiffs allege

that Defendants made statements such as "[T]hese people don't belong here,

---

[14]     Defendants note that "the Third, Sixth, Ninth, and Tenth Circuits have held that the
phrase 'you people' is too ambiguous to constitute direct evidence of race
discrimination." (Def. Br. 11-12).  The Court does not disagree with the conclusion
these courts have drawn.  *Cf.*, *e.g.*, *Murdock* v. *City of Wichita, Kans.*, 525 F. App'x 820,
821 (10th Cir. 2013) (rejecting a Title VII claim based solely on two comments, one of
which included the phrase "you people") (non-binding order); *Umani* v. *Michigan Dep't of
Corr.*, 432 F. App'x 453, 459 (6th Cir. 2011) (concluding that the term "you people" does
not "qualify as a clear reference to race and is not direct evidence of discrimination")
(per curiam); *Anderson* v. *Wachovia Mortgage Corp.*, 621 F.3d 261, 269 (3d Cir. 2010)
(ruling that the phrase "you people" used "in this context ... alone" is not direct evidence
of discrimination); *Walker* v. *Inland Boatman's Union of Pac. Marine Div. of I.L.W.U.*, 6 F.
App'x 571, 573 (9th Cir. 2001) (finding use of the phrase "you people" to be
"ambiguous" without more) (unpublished memorandum).  Here, however, the Court will,
as other courts in this Circuit have done, consider the use of "you people" and similar
phrases by 230 Fifth employees as circumstantial evidence of discriminatory animus to
be considered in the context of all the events of the night of October 10, 2009.

don't deserve to be here" (Davidson Dep. 76:7-8), the phrase gains a more suspect character.

Plaintiffs have provided evidence of discriminatory treatment to contextualize the remarks to which they point in lieu of explicitly derogatory epithets.  Plaintiffs allege that they were treated throughout their time at 230 Fifth with hostility and sarcasm, beginning before any possible legitimate basis for Defendants' treatment of Plaintiff could have existed.  (*See* Owens Dep. 176:17-177:9; Metellus Dep. 95:13-14).  Shortly after Plaintiffs were seated and while discussing the requirement of purchasing bottle service, a manager responded to Owens with open sarcasm, implying that she was lying regarding her efforts to secure a reservation.  (Owens Dep. 131:11-16).  When plaintiffs were ejected, the 230 Fifth staff person responsible was screaming, waving his hands, and turning red in the extremity of his emotion.  (Owens Dep. 168:18-169:5).  And Owens testified that the owner of 230 Fifth, after ejecting them from the restaurant, followed Plaintiffs to the elevator bank and then down to the street, waving his arms for them to continue leaving, and even, after they had left his establishment, ordered them to "[g]o across the street."  (Owens Dep. 181:15-23, 182:19-21, 183:21-22 (internal quotation marks omitted)).  Of course, as the Second Circuit has held, "mistreatment by defendants … is certainly not sufficient to establish" intentional discrimination; notably, however, it "is not irrelevant in assessing the strength of plaintiffs' circumstantial evidence of race-based animus." *Lizardo*, 270 F.3d at 102.

Nor can the baked-goods imbroglio withstand allegations of pretext. Defendants' own witness testified that some groups were permitted to bring in outside baked goods such as cupcakes.  (Rozenberg Dep. 97:17-25).  The presence of cupcakes in the lounge was not a taboo.  Indeed, according to the guest list for October 10, 2009, another party in 230 Fifth that very night had been approved to bring in not merely cupcakes but even a cake (Grindlinger Decl. Ex. I), despite Defendants' submission that such an item was absolutely prohibited in the lounge (Def. 56.1(a) ¶ 71).  Though "a defendant's mere inconsistency, without more, does not show pretext," *Balut* v. *Loral Electronic Systems*, 988 F. Supp. 339, 351 (S.D.N.Y. 1997), nonetheless "inconsistent statements, coupled with … discriminatory remarks and more favorable treatment of similarly situated [individuals], is sufficient to create a triable issue as to pretext," *Ramos*, 134 F. Supp. 2d at 345.

The Court must consider the "entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  *Schnabel* v. *Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves*, 530 U.S. at 143). The Court cannot grant summary judgment for Defendants on this record: a factfinder could conclude that Defendants' sarcasm, hostility, open anger, use of ambiguously derogatory terms, and inconsistent characterization and application of their bottle service and baked-goods policies, provide sufficient evidence of discriminatory intent.  To be clear, this is not to say that Plaintiffs will succeed at trial.  Indeed, there is ample reason to credit Defendants'

32

account of events over Plaintiffs.[15]  But there remain triable issues of fact as to
whether Defendants' purported nondiscriminatory rationales for their actions
towards Plaintiffs are false and whether they were truly motivated by
discriminatory intent.  Defendants' motion for summary judgment on Plaintiffs'
discrimination claims is therefore denied.

### c. Summary Judgment Is Granted as to Plaintiffs' Breach of Contract Claim

Plaintiffs also allege that Defendants breached the contract between 230
Fifth and Owens.  (Compl. ¶ 114).  Remarkably, the entire section of Plaintiffs'
brief devoted to defending this claim against Defendants' motion for summary
judgment consists of 62 words with no legal citation whatsoever:

> Rainell Owens contracted with 230 Fifth to host her birthday party
> on October 10, 2009 and left her credit card information to hold this
> reservation.  In reliance on this agreement, Ms. Owens invited 25-
> 30 friends, many of whom had to travel long distances to attend.
> 230 Fifth breached this agreement when they ejected Ms. Owens
> and her invited guest[s] with no justification.

(Pl. Opp. 14).  Given Plaintiffs' unusually off-handed effort to save the claim,
the Court might justifiably regard Defendants' motion as unopposed on this
issue.  Regardless, Plaintiffs' opposition, perfunctory as it is, fails and
summary judgment is granted.

"The essential elements to pleading a breach of contract under New York
law are the making of an agreement, performance by the plaintiff, breach by

---

[15]     For example, though Owens testified that her party never obstructed the movement of
any staff or patrons of 230 Fifth, her co-plaintiff Ernest Davidson testified that Plaintiffs
"had to keep moving to accommodate the passage of any other customers and/or the
wait staff" (Davidson Dep. 47:23-25), and that there was "[c]ongestion" in the walkway
due to Plaintiffs (*id.* at 48:4-7).

the defendant, and damages suffered by the plaintiff." *Startech*, 126 F. Supp. 2d at 236. Plaintiffs have never unambiguously expressed the theory behind this claim; neither the contract at issue nor the act constituting a breach has ever been clearly articulated. Either Defendants breached their express contract with Owens, or they breached an implied contract with Plaintiffs as a whole. Neither theory is adequate for a variety of reasons. Defendants satisfied their obligations under the Owens contract. Plaintiffs cannot prove they entered into an implied contract with Defendants, even had Plaintiffs bothered to argue such an implied contract existed. Most importantly, no plaintiff suffered damages and so, as a matter of law, Defendants did not commit a breach.

Defendants completely satisfied their obligations under any contract and so cannot be liable for breach. Owens entered the lounge, was seated with 20 guests, and ate cupcakes; her guests paid cash at the bar and she paid no cover charge. In every way this satisfied the terms of the arrangement she testified to have struck on the phone two weeks before the night in question. Admittedly, Owens was required to order bottle service against her expectation; had she paid for that service, there might be a somewhat complex question of whether bottle service as a condition for occupying a seating area is functionally identical to a cover charge or if the two are distinct institutions. Fortunately, the Court need not enter that thicket because Owens did not pay for any of the $250 bottles of liquor she ordered: her card was not charged. (Owens Dep. 192:15-17). Nor did Owens arrange to remain at 230 Fifth for any

34

specific amount of time; though the time Plaintiffs spent in the lounge is disputed (Def. 56.1(a) ¶ 76; Pl. 56.1(b) ¶ 76), it is undisputed that Plaintiffs were seated for at least 90 minutes while they ordered bottle service and ate and drank both food and beverage orders and cupcakes brought in from outside.  Defendants did not breach their contract with Owens: they performed it in full.

Plaintiffs other than Owens certainly never formed any express contract with 230 Fifth, as they had no interactions with the lounge before entering. Whether Plaintiffs might have formed an implied contract is arguably a closer question.  Recovery on a theory of implied contract requires showing "'consideration, mutual assent, legal capacity and legal subject matter.'" *Fink*, 810 F. Supp. 2d at 645 (quoting *Maas*, 721 N.E.2d at 970).  Plaintiffs might argue that 230 Fifth entered an implied contract to provide services by admitting them to the lounge in the first place.  But no evidence in the record could sustain such an argument: there is simply no evidence whatsoever indicating that Plaintiffs and 230 Fifth exchanged consideration or came to mutual agreement regarding their occupancy of the establishment, other than the specific transactions for drinks and food into which individual Plaintiffs entered and which 230 Fifth fully performed.  No implied contract existed with Plaintiffs.

More importantly, Plaintiffs did not argue that such an implied contract existed: their only defense of their breach of contract claims is that "Owens contracted with 230 Fifth to host her birthday party." (Pl. Opp. 14).  The only

reference Plaintiffs make to any of their number other than Owens herself is a suggestion that Owens invited them to 230 Fifth "in reliance" on her contract with the lounge.  (*Id*.).  Plaintiffs, in short, defend their breach of contract claims solely on the basis that Owens had a contract with 230 Fifth, and that Defendants breached that contract with her by ejecting her and her guests. (*Id*.).  The Court has already concluded that Defendants satisfied all their obligations under that contract and so Plaintiffs' cursory opposition is doomed.

Even if Defendants had failed in some particular to satisfy their obligations to Owens or Plaintiffs in general, no Plaintiff suffered damages attributable to Defendants on the night of October 10, 2009.  Though some paid money to 230 Fifth, they received and consumed beverages and food in return.  Several Plaintiffs admitted in their depositions that they had lost nothing from the evening other than, at most, the money they spent to receive food and beverages.  (See Sanders Dep. 102:8-10 ("Q: As a result of what happened at 230 Fifth, did you personally lose any money?  A: No."); Metellus Dep. 154:17-155:5 ("Q: Have you suffered economic loss as a result of what occurred at 230 Fifth?  A: Not directly, no.…  Q: And the money you believe you spent is somewhere around 50 to 75 dollars?  A: Right."); Davidson Dep. 74:21-23 ("Q: As a result of what happened at 230 Fifth, did you lose any money? A: No."); Owens Dep. 192:15-21 ("Q: … [Y]our credit card wasn't charged; correct?  A: Right.  Q: And you didn't have to pay anything in cash, did you? A: No, I don't think so."); Hyacinth Dep. 68:20-22 ("Q: As a result of what happened at 230 Fifth, did you lose any money?  A: Lose, no.").  And it is an

undisputed fact in the record that "Plaintiffs were not economically harmed by" the events of the night in question.  (Def. 56.1(a) ¶ 78).[16]  "Under New York law, a plaintiff must prove the existence of damages with certainty in order to recover for breach of contract."  *S & K Sales Co.*, 816 F.2d at 852.  No Plaintiff here suffered damages and so their breach of contract claim must fail as a matter of law.

Defendants' motion for summary judgment on Plaintiffs' breach of contract claims is granted.

### d.    Summary Judgment Is Denied as to Plaintiff Cletus Hyacinth

Defendants argue that Plaintiff Cletus Hyacinth's claims should be dismissed because he failed to include them in his voluntary petition for bankruptcy in the Eastern District of New York.  (Def. Br. 23-24).  "[A] party who failed to disclose a claim in bankruptcy proceedings" generally cannot assert "that claim after emerging from bankruptcy" based on the doctrine of judicial estoppel.  *Ibok*, 470 F. App'x at 28.  It is undisputed that Hyacinth did not disclose his potential claim against 230 Fifth in his original or amended bankruptcy petitions.  (Def. 56.1(a) ¶¶ 80, 83, 88, 89; Pl. 56.1(b) ¶¶ 80, 83, 88,

---

[16]    Though Plaintiffs attempt to refute Defendants' statement under Local Rule 56, their purported rebuttal cites no evidence at all in support.  (*See* Pl. 56.1(b) ¶ 78).  Indeed, this particular paragraph illustrates exactly why Local Rule 56 requires citation to the record to substantiate individual submissions: paragraph 78 of Plaintiffs' statement claims that Plaintiffs were damaged by paying transportation costs on the night in question, but there is apparently no evidence in the record even suggesting Plaintiffs actually lost money in this way.  Thus Defendants' statement is deemed admitted and is further dispositive of this motion.

89).[17]  Nonetheless, because no court ever adopted Hyacinth's representations regarding his assets, this motion is denied.

Plaintiffs respond that Hyacinth "did not know he had a legal claim against [D]efendant[s] until the suit was filed on 1/13/11," and so was not required to include it in his bankruptcy petition.  (Pl. 56.1(b) ¶ 83).  Thus, Plaintiffs argue, Hyacinth should "not lose standing to maintain civil suits." (Pl. Opp. 15-16).  The latter half of Plaintiffs' argument is nonresponsive, as Defendants' position is not that Hyacinth lacks standing, but rather that his claims should be equitably foreclosed.  (Def. Reply 10).  Nonetheless, there is at least a colorable argument that a debtor, after emerging from bankruptcy, should not be precluded from pursuing claims of which he was truly ignorant at the time of his petition.

The Court need not, however, determine here whether Hyacinth's purported ignorance of his claims in this action at the time of his bankruptcy petition is enough to invoke the "good faith" exception to judicial estoppel.  *See Simon* v. *Safelite Glass Corp.*, 128 F.3d 68, 73 (2d Cir. 1997).  That doctrine requires that "the party's former position has been adopted in some way by the court in the earlier proceeding."  *DeRosa*, 595 F.3d at 103.  Here, Hyacinth's petition was dismissed on the grounds of his own unreasonable delay; he did not discharge his debts.  (Def. 56.1(a) ¶ 90; Pl. 56.1(b) ¶ 90).

---

[17]    Here, too, Plaintiffs purport to deny paragraphs 83 and 89 without citing any evidence, and thus these statements are deemed admitted.

Courts have come to different outcomes on whether a dismissal due to some fault on the part of the debtor, as opposed to discharge, constitutes an "adoption" by the bankruptcy court of the content of the petition's factual averments so as to invoke estoppel. *Compare Kunica* v. *St. Jean Fin., Inc.*, 233 B.R. 46, 59*, order amended on denial of reconsideration*, 63 F. Supp. 2d 342 (S.D.N.Y. 1999) ("Regardless of what the bankruptcy court might have done had it known of the Claims, it is arguable that the bankruptcy court [by dismissing the petition] adopted [the debtor's] position concerning its assets."), *with B.N. Realty Associates* v. *Lichtenstein*, 801 N.Y.S.2d 271, 276 (Sup. Ct. 2005) ("'The doctrine of judicial estoppel, which, in a bankruptcy context, bars a party from pursuing claims not listed in a bankruptcy proceeding that resulted in the party's discharge, does not apply in the absence of a final determination in the bankruptcy proceeding endorsing the party's inconsistent position concerning his or her assets.'" (quoting *Koch* v. *National Basketball Assn.*, 666 N.Y.S.2d 630 (App. Div. 1997)).

The undisputable rule remains that judicial estoppel "applies only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position." *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990). There are no doubt settings other than a final judgment in favor of the putatively estopped party that could suffice to invoke the doctrine. In the *Kunica* case, for example, the petition was dismissed on the basis of the debtor's avowal to the bankruptcy court that "no purpose would be served by Debtor remaining in bankruptcy." *Kunica*, 233

39

B.R. 46, 59 (internal quotation marks omitted).  The bankruptcy judge's dismissal of the petition, then, was in part based on an adoption of the debtor's position that it had fully disclosed all its assets and adequately resolved all outstanding issues with its creditors on the basis of those disclosures — something that simply could not be the case had there been a failure to disclose a claim for damages.  *Id.*  Here, by contrast, the bankruptcy court did not in any way rely on Hyacinth's disclosures.  The dismissal was punitive, not a reward; it was motivated by Hyacinth's own procedural failures, not by the content of his petition.

Of course, it could easily be argued that "[o]ne of the main purposes of the doctrine — to protect the integrity of the judicial system, and the bankruptcy process in particular, in ensuring full and honest disclosure — would be frustrated if the doctrine were not applied here."  *Myers* v. *Bimbo Bakeries USA, Inc.*, No. 08 Civ. 1179 (CBA), 2011 WL 1240095, at *6 (E.D.N.Y. Feb. 10, 2011), *report and recommendation adopted*, No. 08 Civ. 1179 (CBA) (SMG), 2011 WL 1211603 (E.D.N.Y. Mar. 30, 2011).  But regardless of the underlying policy goals animating the doctrine of judicial estoppel, the doctrine has three clear requirements and Hyacinth's case does not satisfy one of them: absent any kind of adoption of Hyacinth's position by the bankruptcy judge, he should not be estopped from pressing his claims here.  Defendants' motion for summary judgment as to Plaintiff Cletus Hyacinth is denied.

### e.    Summary Judgment Is Granted as to Plaintiff Rainell Owens

Unlike with Cletus Hyacinth, Owens' bankruptcy clearly suffices to invoke judicial estoppel: she now, to the prejudice of Defendants, presses claims against them that she failed to disclose in her bankruptcy petition, and that petition provided the basis for the discharge of her debts by a bankruptcy judge.  (Def. 56.1(a) ¶¶ 79, 81, 82, 87; Pl. 56.1(b) ¶¶ 79, 81, 82, 87).[18]  Owens even filed an amended schedule of assets and debts in support of her petition and again failed to make any disclosure of her claims against Defendants. (Def. 56.1(a) ¶¶ 85, 86; Pl. 56.1(b) ¶¶ 85, 86).

Plaintiffs attempt to rebut the truthfulness of Defendants' factual submissions, and the substance of their legal argument, by insisting that Owens "did not know she had a legal claim against defendants until 1/13/11 when her attorneys filed the complaint in this action," and that at the time she filed for bankruptcy, had not "'heard anything about'" her case and "'wasn't sure what was happening.'"  (Pl. 56.1(b) ¶ 81 (quoting Owens Dep. 238:5-7); *see also id.* at ¶¶ 82, 86; Pl. Opp. 14-16).  Owens should in consequence,

---

[18]    Plaintiffs attempt to rebut Defendants' factual submissions regarding the bankruptcy issue by insisting that neither party knew whether he or she "had a legal claim against defendant[s]" until this suit was actually filed.  (*See, e.g.*, Pl. 56.1(b) ¶ 81).  This statement simply does not respond to Defendants' submission that the Plaintiffs in question "did not include or otherwise reference" claims against Defendants in their bankruptcy petitions, and so Defendants' submission is deemed admitted on these points.  When contesting whether Plaintiffs were "aware of" their claims against Defendants at the time of the bankruptcy filings, these submissions are not procedurally improper, but are ultimately unsatisfying, because they beg the critical question rather than answer it: what standard should apply to determine whether Plaintiffs were "aware" of their claims?  The Court ultimately finds, as explained below, the Owens was "aware" of her claims as relevant for estoppel analysis.

Plaintiffs insist, benefit from the "good faith" exception to the judicial estoppel doctrine.

Fair enough.  But "[b]ankruptcy petitioners have an affirmative obligation to disclose all assets to the bankruptcy court, including all causes of action that can be brought by the debtor," *Coffaro* v. *Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010) (citing 11 U.S.C. §§ 521(a)(1), 541(a)(1)) (internal quotation marks omitted), and the bankruptcy system as a whole is grounded on the proposition that "'creditors have a right to know what the debtor's assets are even though the potential may be contingent, dependent, or conditional,'" *Kunica*, 233 B.R. at 56 (quoting *Westland Oil Dev. Corp.* v. *MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 103 (S.D. Tex. 1993)).  The Second Circuit has not yet told us whether good faith mistakes to include a specific asset in an earlier bankruptcy proceeding should invoke estoppel, though many circuits have concluded estoppel should apply.  *See Eastman* v. *Union Pac. R.R. Co.*, 493 F.3d 1151, 1157 (10th Cir. 2007); *Barger* v. *City of Cartersville*, 348 F.3d 1289, 1294 (11th Cir. 2003); *Browning* v. *Levy*, 283 F.3d 761, 776 (6th Cir. 2002); *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999).

More to the point, Owens did not make a good faith mistake of the kind examined elsewhere in this context.  *Cf. Galin* v. *I.R.S.*, 563 F. Supp. 2d 332, 341 (D. Conn. 2008) ("[T]he Court … accepts [the plaintiff's] position that she had no knowledge of [the disputed claim] at the time of her bankruptcy proceeding….  Unfortunately, this narrative … cannot preclude the application of judicial estoppel.").  Owens was aware of the perceived wrong perpetrated

42

against her by Defendants when she filed for bankruptcy; indeed, she warned 230 Fifth employees to expect legal action even as the events giving rise to this litigation were still unfolding.  (Owens Dep. 183:9-10 ("I said 'you'll hear from my attorney,' and that was the last thing I said….")).  Whether or not Ownes had received advice of counsel at the time of her bankruptcy petition that her claim was legally colorable did not alter its status as a "potential" asset "contingent" on her attorney's ratification and ultimate success in court, *see Kunica*, 233 B.R. at 56.  Owens might more accurately have explained to the Court that both her bankruptcy attorney and her attorney in this action failed to explain that her pending, unfiled claim against Defendants constituted an asset for bankruptcy purposes.  But "legal advice and ignorance of the law are not defenses to judicial estoppel." *Galin*, 563 F. Supp. 2d at 341; *see also Negron* v. *Weiss*, No. 06 Civ. 1288 (CBA), 2006 WL 2792769, at *5 (E.D.N.Y. Sept. 27, 2006) ("'[A] debtor in bankruptcy is bound by her own representations, no matter why they were made….  The remedy for bad legal advice lies in malpractice litigation against the offending lawyer.'" (quoting *Cannon-Stokes* v. *Potter*, 453 F.3d 446, 449 (7th Cir. 2006) (alterations in *Negron*))).

Accordingly, Defendants' motion for summary judgment as to Plaintiff Rainell Owens is hereby granted.

### 2.    Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment on Defendants' counterclaims. Their motion is denied as to Defendants' counterclaim for tortious interference

with prospective economic advantage and granted as to Defendants'
counterclaim for tortious interference with contract.

### a.   Plaintiffs' Local Rule 56.1(a) Statement Is Stricken

The Statement of Undisputed Facts submitted pursuant to Local Rule 56
in support of Plaintiffs' motion for summary judgment is deficient in myriad
ways.  First, it is unsigned, despite the clear language of Federal Rule of Civil
Procedure 11(a), and despite this lapse "being called to" the attention of
Plaintiffs' counsel.  *See* Fed. R. Civ. P. 11(a); Def. Opp. 4-5.  On this basis the
Court "must strike" the unsigned statement.  Fed. R. Civ. P. 11(a).  Second,
even if not procedurally defaulted, the Statement's contents are unsupported:
contrary to the directive of Local Rule 56.1(d) that "[e]ach statement by the
movant … must be followed by citation to evidence which would be admissible,"
Plaintiffs did not cite a single piece of evidence to support their ostensibly
undisputed facts.  (*See* Pl. 56.1(a)).  Thus, even were the Court able to accept
this Statement, no fact therein submitted would actually stand undisputed.

Plaintiffs' 56.1(a) statement is stricken from the record and the Court will
not consider its content.  Defendants seek on this basis denial of the motion in
its entirety, quoting Local Rule 56.1(a): "Failure to submit such a statement
may constitute grounds for denial of the motion."  Yet "[a] district court has
broad discretion to determine whether to overlook a party's failure to comply
with local court rules."  *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir.
2001).  Though the Second Circuit has made clear that a district court is "'not
required to consider what the parties fail to point out' in their Local Rule 56.1

statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement." *Id.* (quoting *Monahan* v. *New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).  The Court will proceed to consider the substance of Plaintiffs' motion.

### b.    Summary Judgment Is Denied as to Defendants' Tortious Interference with Prospective Economic Advantage Claim

"To state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege that: '[i] it had a business relationship with a third party; [ii] the defendant knew of that relationship and intentionally interfered with it; [iii] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [iv] the defendant's interference caused injury to the relationship.'" *Fifth Street*, 2013 WL 3757037, at *3 (quoting *Kirch*, 449 F.3d at 400).  Because genuine issues of material fact exist as to whether Defendants can establish the elements of this claim, Plaintiffs' motion for summary judgment is denied.

Defendants contend in this counterclaim that some Plaintiffs, upon leaving 230 Fifth, blocked the line of individuals waiting to enter the lounge and urged potential customers not to patronize the establishment on the grounds of its alleged discriminatory conduct.  (Def. 56.1(b) ¶¶ 1, 2, 5).  These individuals were "potential guests."  (Rozenberg Dep. 71:21).  Defendants, relying on Rozenberg's testimony regarding the groups he saw leave the line, insist that 230 Fifth lost patrons whose business it would otherwise have received.  (Def. 56.1(b) ¶ 4).  Thus, on Defendants' version of the facts,

45

Defendants had a prospective relationship with potential guests waiting outside 230 Fifth and Plaintiffs intentionally injured that relationship by obstructing the line and shouting at patrons to leave.  This establishes all but the third element of the cause of action.  Defendants can pass that hurdle as well.  A factfinder could conclude that standing in the doorway of the lounge, shouting that 230 Fifth was a "terrible club," and warning individuals in line not to enter (Rozenberg Dep. 52:6-12), constituted actions undertaken "'for the sole purpose of inflicting intentional harm'" on Defendants, *Enzo Biochem*, 2013 WL 6987615, at *3 (quoting *Plasticware*, 852 F. Supp. 2d at 403).

To be sure, and as Plaintiffs contend, Defendants cannot identify individual Plaintiffs who participated in the incident outside 230 Fifth.  (Pl. Br. 4-5).  Yet the evidence here is not as Plaintiffs suggest: Rozenberg testified that some number of Plaintiffs, at a minimum three to five, stood obstructing the door.  (Rozenberg Dep. 48:20-49:3).  The Court has not been asked to determine, and will not do so on its own motion, whether Defendants could prove liability against some or all Plaintiffs and, if so, against which.  Plaintiffs have not shown that no reasonable factfinder could find some or all of their number liable on this claim, and thus their motion must fail.

### c.    Summary Judgment Is Granted as to Defendants' Tortious Interference with Contract Claim

Tortious interference with contract requires that: (i) a valid contract exist between the plaintiff and a third party; (ii) the defendant actually knew of that contract; (iii) the defendant intentionally and without justification brought about the third party's breach of that contract; (iv) the contract was actually

46

breached; and (v) the plaintiff was damaged by the breach.  *See CHoldings*, 2013 WL 6987165, at *14.  Plaintiffs' motion is granted because, at a minimum, Defendants cannot establish the existence of a contract between 230 Fifth and any individual driven from the line outside 230 Fifth by Plaintiffs' alleged disruption.

Notably, 230 Fifth's own employee Salmon Rozenberg described the individuals waiting in line outside the lounge as "potential guests," not guests in fact or guests with reservations.  (Rozenberg Dep. 71:21).  There simply was no express contract at all between 230 Fifth and any individuals in line. Defendants, in an argument perhaps more clever than wise, suggest that "Plaintiffs cannot state on one hand that they had a contract with 230 Fifth to spend time inside the lounge and on the other state that all other individuals who wanted to do the same thing did not have a contract with 230 Fifth."  (Def. Opp. 11).  Defendants themselves maintain in their own motion for summary judgment that no contract existed between 230 Fifth and any Plaintiff other than Rainell Owens, who had arranged a reservation for her party in advance. (Def. Br. 21-22).  And the Court has already come to that very conclusion above.

But even worse, Defendants' too-clever-by-half argument does not follow: the claim that patrons admitted to a restaurant had entered into an implicit contract for services is far different from the claim that any person expressing interest in entering a restaurant had executed a similar contract.  And irrespective of Defendants' inconsistent position, no implied contract existed

here.  As Defendants observed in their own motion for summary judgment, absent an express contract, any breach of contract claim must rely on the existence of an implied contract.  (Def. Br. 21-22).  Defendants do not even bother to make this — legally indispensable — argument in their opposition papers.  Perhaps this omission is for good reason, as such an argument would obviously fail.  The formation of an implicit contract requires "consideration, mutual assent, legal capacity and legal subject matter."  Just as above, Defendants cannot prove that they came to mutual assent with individuals standing in line outside 230 Fifth regarding the terms of an agreement, nor does the record in any way reflect an exchange of consideration between 230 Fifth and any such individual.

In short, the record contains no evidence that a contract of any kind existed between Defendants and any individual whose business 230 Fifth ultimately lost on the night in question.  Defendants thus cannot establish the elements of a claim for tortious interference with contract and Plaintiffs' motion for summary judgment in this respect is granted.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is DENIED as to Plaintiffs' discrimination claims and GRANTED as to Plaintiffs' breach of contract claim.  Defendants' motion for summary judgment on the grounds of judicial estoppel is DENIED as to the claims of Cletus Hyacinth and GRANTED as to the claims of Rainell Owens.  Plaintiffs' motion for summary judgment is DENIED as to Defendants' tortious interference with

prospective economic advantage claim and GRANTED as to Defendants'
tortious interference with contract claim.

The parties are hereby ORDERED to appear for a pretrial conference on
March 11, 2014, at 11:00 a.m. in Courtroom 618 of the Thurgood Marshall
Courthouse, 40 Foley Square, New York, New York.

SO ORDERED.

Dated:  February 21, 2014
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

49